UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUADLOGIC CONTROLS CORPORATION,<br><br>                                           Plaintiff,<br><br>                  -against-<br><br>POUNCE ELECTRONICS S.A. DE C.V., d/b/a POUNCE CONSULTING,<br><br>                                           Defendant. | No. 1:18-cv-00400-ER<br><br>**ANSWER, AFFRIMATIVE**<br>**DEFENSES AND COUNTERCLAIMS** |

Pounce Electronics S.A. de C.V. ("Pounce" or "Defendant") by its attorneys, Olshan Frome Wolosky LLP, as and for its Answer, Affirmative Defenses, and Counterclaims to the Complaint served by plaintiff Quadlogic Controls Corporation ("Quadlogic" or "Plaintiff"), alleges as follows:[1]

1. Denies the allegations set forth in paragraph 1 of the Complaint, except admits that it is a citizen of Mexico with its principal place of business in Jalisco, Mexico, denies knowledge or information sufficient to form a belief as to the truth of Plaintiff's allegations concerning its citizenship or principal place of business, and respectfully refers all legal questions to the Court.

2. Denies the allegations set forth in paragraph 2 of the Complaint, and respectfully refers all legal questions to the Court.

3. Denies the allegations set forth in paragraph 3 of the Complaint, denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning

---

[1] Any allegation not specifically admitted herein is denied.

4542089-4

Plaintiff's organization or principal place of business, and respectfully refers all legal questions to the Court.

4. Admits the allegations set forth in paragraph 4 of the Complaint.

5. Repeats and realleges its responses to paragraphs 1-4 of the Complaint as though fully set forth herein.

6. Denies the allegations set forth in paragraph 6 of the Complaint, and respectfully refers all legal questions to the Court.

7. Denies the allegations set forth in paragraph 7 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

8. Denies the allegations set forth in paragraph 8 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

9. Denies the allegations set forth in paragraph 9 of the Complaint.

10. Denies the allegations set forth in paragraph 10 of the Complaint.

11. Repeats and realleges its responses to paragraphs 1-10 of the Complaint as though fully set forth herein.

12. Denies the allegations set forth in paragraph 12 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

13. Denies the allegations set forth in paragraph 13 of the Complaint.

14. Denies the allegations set forth in paragraph 14 of the Complaint.

15. Denies the allegations set forth in paragraph 15 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

16. Denies the allegations set forth in paragraph 16 of the Complaint.

17. Denies the allegations set forth in paragraph 17 of the Complaint.

18. Denies the allegations set forth in paragraph 18 of the Complaint.

19. Denies the allegations set forth in paragraph 19 of the Complaint.

20. Denies the allegations set forth in paragraph 20 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

21. Denies the allegations set forth in paragraph 21 of the Complaint.

22. Denies the allegations set forth in paragraph 22 of the Complaint.

23. Denies the allegations set forth in paragraph 23 of the Complaint.

24. Denies the allegations set forth in paragraph 24 of the Complaint.

25. Denies the allegations set forth in paragraph 25 of the Complaint.

26. Denies the allegations set forth in paragraph 26 of the Complaint.

27. Denies the allegations set forth in paragraph 27 of the Complaint.

28. Denies the allegations set forth in paragraph 28 of the Complaint.

29. Denies the allegations set forth in paragraph 29 of the Complaint.

30. Repeats and realleges its responses to paragraphs 1-29 of the Complaint as though fully set forth herein.

31. Denies the allegations set forth in paragraph 31 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

32. Denies the allegations set forth in paragraph 32 of the Complaint, denies the enforceability of the License, and respectfully refers all legal questions to the Court.

33. Denies the allegations set forth in paragraph 33 of the Complaint.

34. Repeats and realleges its responses to paragraphs 1-33 of the Complaint as though fully set forth herein.

3
4542089-4

35. Admits that in paragraph 35 of the Complaint Plaintiff quotes from the purported License, though Pounce denies the enforceability of that agreement, and respectfully refers all legal questions to the Court.

36. Denies the allegations set forth in paragraph 36 of the Complaint.

37. Denies the allegations set forth in paragraph 37 of the Complaint.

38. Denies the allegations set forth in paragraph 38 of the Complaint.

39. Repeats and realleges its responses to paragraphs 1-38 of the Complaint as though fully set forth herein.

40. Admits that in paragraph 40 of the Complaint Plaintiff quotes from the purported License, though Pounce denies the enforceability of that agreement, and respectfully refers all legal questions to the Court.

41. Denies the allegations set forth in paragraph 41 of the Complaint, denies the enforceability of the purported License, and respectfully refers all legal questions to the Court.

42. Denies the allegations set forth in paragraph 42 of the Complaint.

43. Denies the allegations set forth in paragraph 43 of the Complaint.

44. Denies the allegations set forth in paragraph 44 of the Complaint.

45. Repeats and realleges its responses to paragraphs 1-44 of the Complaint as though fully set forth herein.

46. Denies knowledge or information sufficient to form a belief as to whether Quadlogic "owns various trade secrets . . . which are protected by the Economic Espionage Act," denies that any trade secrets were ever provided to Pounce or that any such trade secrets would be protected by the Economic Espionage Act, and respectfully refers all legal questions to the Court.

47. Denies the allegations set forth in paragraph 47 of the Complaint, denies the enforceability of the purported License, and respectfully refers all legal questions to the Court.

48. Denies the allegations set forth in paragraph 48 of the Complaint, and respectfully refers all legal questions to the Court.

49. Repeats and realleges its responses to paragraphs 1-48 of the Complaint as though fully set forth herein.

50. Denies the allegations set forth in paragraph 50 of the Complaint.

51. Denies the allegations set forth in paragraph 51 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

52. Plaintiff's claims are barred, in whole or in part, because the Court has no personal jurisdiction over Pounce.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

53. The complaint fails, in whole or in part, to state a claim upon which relief can be granted.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

54. Plaintiff's claims are barred, in whole or in part, by its unclean hands.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

55. Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, waiver, and/or equitable estoppel.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

56. Plaintiff's claims are barred, in whole or in part, by its bad faith, fraud, and/or misrepresentation.

## **AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**

57. Plaintiff's claims are barred, in whole or in part, by its own inequitable conduct.

## **AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

58. Plaintiff's claims are barred, in whole or in part, by its own breaches of the purported License.

## **AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE**

59. Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

## **AS AND FOR A NINTH AFFIRMATIVE DEFENSE**

60. Plaintiff's claims are barred, in whole or in part, because it has frustrated performance by Pounce of the purported License.

## **AS AND FOR A TENTH AFFIRMATIVE DEFENSE**

61. Plaintiff's claims are barred, in whole or in part, because the terms of the purported License are unconscionable.

## **AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE**

62. Plaintiff's claims are barred, in whole or in part, because to the extent that Pounce entered into the purported License it did so only under duress.

## **AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE**

63. Plaintiff's claims are barred, in whole in part, because Pounce did not receive adequate consideration in exchange for purportedly entering into the License.

## **AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE**

64. Plaintiff's claims are barred, in whole or in part, because the relief that Quadlogic seeks would contravene public policy.

## COUNTERCLAIMS

### A. The Quadlogic and Pounce Relationship

1. Beginning in 2010, Quadlogic turned to Pounce to gain entry into the Mexican power market for purposes of manufacturing, promoting and selling electrical energy usage monitoring and measuring products and systems.

2. While Quadlogic has a Mexican affiliate ("Quadlogic Mexico") through which it attempted to sell and promote its products, those efforts were unsuccessful. In particular, throughout 2010, Quadlogic Mexico had difficulty installing its smart meters due to multiple software, hardware and support failures, as well as difficulties in obtaining certification from the Comision Federal de Electricidad of Mexico ("CFE"), the national Mexican public utility, necessary to provide such services in Mexico. Upon information and belief, Quadlogic was unable to produce a fully operational metering system for use in Mexico.

3. Quadlogic approached Pounce, which has successfully engineered and delivered power services and products in Mexico, about using Quadlogic technology to secure and complete power projects in Mexico.

### B. The Aldesa Project

4. Soon thereafter, Quadlogic and Pounce entered into a verbal agreement whereby Pounce would pay Quadlogic royalties for licensing Quadlogic's technology for manufacturing and distributing electrical power metrology machines to third parties, in particular, the Aldesa Group, for provision to the CFE. Quadlogic agreed to obtain valid certification in Mexico, and to provide, among other things, meters, associated hardware and software – including a tiny server interpreter, harness solutions for cabinets – fixtures, training and support, calibrators, and AC connectivity support. Pounce agreed to manufacture and sell the systems and pay a $20,000

USD royalty for each metering point distributed to Aldesa for sale to the CFE (the "Aldessa Agreement").

5. Quadlogic entirely failed to deliver what it had agreed to. Quadlogic did not deliver tiny servers, CLI interpreters for the connectivity, support, harness solutions for the cabinets, calibration sockets testers, training of CFE personnel, test bench software, fixtures, AC connectivity or customer support. Pounce was forced to manufacture and produce the materials notwithstanding these omissions from Quadlogic, including by, in many cases, correcting technical problems with its own expertise and materials and developing its own hardware and software to cure the errors introduced by Quadlogic's materials, which had a degrading effect on the delivery of effective power usage measurement by CFE.

### C. The Dragon Project

6. Quadlogic and Pounce entered into a similar verbal agreement with respect to Dragon Systems, again for supplying to CFE (the "Dragon Agreement"). However, because the project associated with the Dragon Agreement was larger and more complex than the Aldessa project, it required additional resources and support – much of which Quadlogic agreed to provide, including: a radio frequency solution system, Sentinel graphic software, SIG AMI software interface, error free firmware, central design architecture, training for CFE personnel, fixtures, and an ability to perform a "local read" on software for tablets. The project also required additional efforts by Pounce to correct and enhance Quadlogic software and systems. Thus, under the Dragon Agreement, rather than a pure per-meter point royalty split, Quadlogic and Pounce agreed on a 50/50 split of net profits for the Dragon project.

7. Again, with respect to the Dragon Agreement, Quadlogic entirely failed to deliver what it had agreed to, including radio frequency solution systems, central design architecture,

local read software on tablets, sentinel graphic software, SIG AMI software interface, training for CFE personnel, test bench software and design, fixtures, and customer support.

8. Quadlogic did not deliver tiny servers, CLI interpreters for the connectivity, support, harness solutions for the cabinets, calibration sockets testers, training of CFE personnel, test benches, fixtures AC connectivity or customer messaging support.

9. Quadlogic firmware and software experienced frequent and varied fatal errors, including loss of display in the meters, inaccurate readings, spontaneous reset in measurements (with loss of historical readings), frozen error messages, random control module reboots, failed updates, and other technical deficiencies that made effective delivery of electrical metering nearly impossible, absent Pounce's corrective efforts described above.

10. Quadlogic hardware also suffered from substantial flaws, including obsolete components, short circuiting, electrical safety failures, jumper insufficiencies, and overall connectivity shortcomings, again all requiring corrective action by Pounce.

### D. Quadlogic's Certification is Scrutinized by the Mexican Government and Quadlogic Seeks to Extricate Itself From Liability

11. While Pounce worked to correct Quadlogic's errors, by March 2016, CFE had discovered that Quadlogic's certification documentation for the metering systems was noncompliant. CFE requested that Quadlogic perform new testing. The testing persisted through November 2016, with multiple failures by Quadlogic. Upon information and belief, Quadlogic was desperate to obtain the necessary approvals. Upon information and belief, Quadlogic masked the systems' deficiencies and obtained clearance despite the systems' non-compliance.

12. While Quadlogic's certification was subject to scrutiny, and additional testing on its products by CFE, in October 2016, Pounce and Quadlogic entered into a one-page written

contract for Pounce's manufacturing of metering systems with the inclusion of Quadlogic components and use of the license of Quadlogic products (the "Original Agreement"). The agreement acknowledged the multiple fixes required by Pounce on Quadlogic's materials and the negative financial drain such fixes had on Pounce, and the economics of the Dragon Agreement in particular. The parties operated under this Original Agreement while they discussed entering into an amended agreement. During this time, Pounce continued to make payments to Quadlogic (roughly $2.05 million in the aggregate for the two projects).

13. As problems persisted with Quadlogic's performance and provision of agreed-upon services, and while scrutiny of Quadlogic sharpened at CFE, Quadlogic representatives became increasingly aggressive with Pounce. Upon information and belief, based on its experience with the CFE testing, Quadlogic sought to escape liability for its products and to absolve itself of any liability in Mexico, to CFE, or to Pounce.

14. To that end, on February 23, 2017, and as problems with CFE and Quadlogic's components persisted, Quadlogic abruptly demanded that Pounce execute a new "master agreement" that was a complete refutation of the parties' existing agreement and imposed decidedly one-sided terms in favor of Quadlogic (the "Quadlogic Amendment").

15. In particular, the Quadlogic Amendment purported to absolve Quadlogic of virtually all liability for its actions or its products, and forced accelerated royalty terms on Pounce. The so-called "license" provided to Pounce was also one-sided. While it demanded exclusivity from Pounce and imposed restrictive covenants over five years, Quadlogic retained the right to license its products to other entities, even in the same geographic region as Pounce (although Pounce was prohibited from using <u>any</u> software, hardware or any other materials – including developing its own – other than what Quadlogic provided). While it had no

relationship whatsoever to the license, the Quadlogic Amendment also purported to prohibit Pounce or any of its principals or affiliates from acquiring any additional shares in Quadlogic – the sole purpose of which was to prohibit any challenge to Quadlogic's entrenched management.

16.     Increasingly concerned about litigation in Mexico, Quadlogic attempted to demand Pounce's consent to litigate any dispute surrounding the agreement in the Southern District of New York (notwithstanding that Pounce had no contact with the United States other than the parties' existing agreement, which was fully performed in Mexico).

17.     Seeking to extricate itself from its own performance failures, and knowing the continuing provision of functioning electrical measurement in Mexico for the Aldessa and Dragon projects (and thus CFE) required Quadlogic to maintain the calibrators that it controlled, Quadlogic presented Pounce with an ultimatum.  Quadlogic, through its representatives, demanded that Pounce's representative immediately execute the Quadlogic Amendment, or Quadlogic would turn off the firmware needed to operate the calibrators and shut down operation of the power measuring system to Mexican consumers.

18.     The results of such an outcome would have been disastrous for Pounce and Mexican citizens.  Both the Dragon and Aldessa projects would have failed and millions of citizens' power systems interrupted.  The outcome would be a financial ruin for Pounce and incur potential exposure to the Mexican electrical utility (CFE) and government.

19.     Without any meaningful alternative or opportunity to review the agreement, Pounce's representative reluctantly signed the Quadlogic Amendment.

20.     But Quadlogic once again failed to live up to even its most basic obligations under the Quadlogic Amendment.

21. Quadlogic continued to deliver faulty, incomplete materials and non-functioning hardware and software, as well as virtually no technical support, training or guidance, as it had agreed to.

22. Pursuant to Schedule G of the Quadlogic Amendment, Quadlogic was obligated to deliver manufacturing support focused on correcting calibrator deficiencies (including technical support from 8am-6pm daily during the work-week).

23. Also pursuant to Schedule G, Quadlogic was obligated to deliver calibrator performance support and maintenance, including, as "Immediate Action" items: (i) to review and analyze firm meters; (ii) develop a re-work plan on Quadlogic's meters; (iii) install year-round connectivity support for the Dragon project; (iv) provide 99.9% availability of Quadlogic server to the cloud (and maintain adequate back-ups); (v) guarantee four-hour average time to restore per calibrator; (vi) ensure 1 business day resolution time on calibrator issues; (vii) ensure four hour response time and immediate containment for downed lines; (viii) ensure on-site certification of the calibrator install and configuration for manufacturing; (ix) provide documented maintenance schedules and procedures for calibrators; and (x) implement training programs and certification of Pounce Equipment Engineers to support calibrators.

24. Furthermore, pursuant to Schedule G, Quadlogic agreed to provide "Product Engineering Support for the Purposes of Manufacturing and Operating," which included: (i) sending calibrator spare parts manufactured by QLC to Pounce in Guadalajara; and (ii) providing a team of two engineers to Guadalajara to analyze calibrator performance.

25. Quadlogic also agreed to provide documented troubleshooting for filed engineers and to provide training and certification of the Pounce Product Engineering for end-user support, manufacturing rework workflows and return merchandise workflow.

26. Despite receiving hundreds of thousands of dollars in continuing royalties, Quadlogic completely abdicated its responsibilities and obligations under the Quadlogic Amendment and was willfully and grossly negligent in its performance.

27. As a result of Quadlogic's conduct, Pounce has suffered millions of dollars in damages related to the Aldessa and Dragon projects, and other losses, including loss of reputation and goodwill in Mexico.

## FIRST COUNTERCLAIM
### (BREACH OF CONTRACT -- ORIGINAL AGREEMENT)

28. Pounce repeats and re-alleges each of the allegations above as if set forth fully herein.

29. Pounce and Quadlogic had a binding enforceable contract for the licensing of Quadlogic property and provision of related support and deliverables of hardware, software, testing, support and other services, in exchange for payments pursuant to oral agreement and as reflected in the Original Agreement.

30. Pounce performed under the parties' Original Agreement.

31. Quadlogic breached that agreement as set forth above, and causing damage to Pounce.

## SECOND COUNTERCLAIM
### (BREACH OF CONTRACT -- QUADLOGIC AMENDMENT (PLED IN THE ALTERNATIVE))

32. Pounce repeats and re-alleges each of the allegations above as if set forth fully herein.

33. Pounce and Quadlogic had a binding enforceable contract in the Quadlogic Amendment.

34. Pounce performed under the Quadlogic Amendment.

35. Quadlogic breached that agreement as set forth above, and causing damage to Pounce.

## THIRD COUNTERCLAIM
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

36. Pounce repeats and re-alleges each of the allegations above as if set forth fully herein.

37. Pounce and Quadlogic entered into the Original Agreement only as an interim step so that the parties could negotiate a more comprehensive agreement.

38. Rather than negotiate a new agreement with Pounce in good faith, Quadlogic abruptly presented Pounce with a new "master agreement," which included entirely one-sided terms in favor of Quadlogic and turned the Original Agreement on its head.

39. As described above, the Quadlogic Amendment (a) absolved Quadlogic of all liability, (b) forced accelerated royalty terms on Pounce, (c) demanded exclusivity from Pounce and imposed other restrictive covenants, even though Quadlogic retained the right to license its products to other entities, and (d) purported to prohibit Pounce from acquiring any additional shares in Quadlogic.

40. Although the parties had already entered into the Original Agreement, in order to force Pounce's hand, Quadlogic threatened to turn off the firmware necessary to operate the calibrators and shut down operation of the power measuring system to Mexican consumers.

41. Quadlogic knew that Pounce would have no choice but to agree to the terms of the Quadlogic Amendment because the actions threatened by Quadlogic would have forced Pounce out of business and would have impacted power services for millions of Mexican citizens.

42. When Pounce entered into the Original Agreement, it reasonably understood that Quadlogic had impliedly promised to negotiate the master agreement in good faith, and that the Original Agreement was entered into only as an interim step for the purpose of good faith negotiations.

43. Had Pounce known when it entered into the Original Agreement that Quadlogic would cease all efforts to negotiate a good faith master agreement, it never would have entered into the Original Agreement.

44. Quadlogic's actions destroyed and injured Pounce's right to receive the fruits of the bargain.

45. Quadlogic breached that agreement as set forth above, causing damage to Pounce.

## FOURTH COUNTERCLAIM
## (UNJUST ENRICHMENT)

46. Pounce repeats and re-alleges each of the allegations above as if set forth fully herein.

47. Quadlogic has been enriched by its wrongful retention of royalties and other value, based deceit and exploitation of its relationship of trust and confidence with Pounce.

48. It is against equity and good conscience to permit Quadlogic to retain such royalty payments at Pounce's expense given, inter alia, Quadlogic's failure to deliver functioning products and services as agreed to Pounce.

49. Pounce has been damaged by Quadlogic's unjust enrichment as set forth above.

## JURY DEMAND

Pounce demands a trial by jury as of right on all counts.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counter-Claim Plaintiff Pounce prays that judgment be entered:

A. Dismissing Quadlogic's complaint in its entirety;

B. Awarding Pounce damages for Quadlogic's breach of contract in an amount to be determined at trial but believed to be in excess of $5,000,000;

C. Awarding Pounce damages for Quadlogic's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial but believed to be in excess of $5,000,000;

D. Awarding Pounce damages for Quadlogic's unjust enrichment in an amount to be determined at trial but believed to be in excess of $5,000,000; and

E. Granting such other and further relief as the Court deems just and proper.


Dated: New York, New York
       March 12, 2018

OLSHAN FROME WOLOSKY LLP

By: _____/s/ Brian A. Katz_____
    1325 Avenue of the Americas
    New York, New York 10019
    (212) 451-2300

    *Attorneys for Defendant Pounce*
    *Electronics S.A. DE C.V.*